## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| WRTGC-COMMERCIAL, LLC, | ) | |
| d/b/a/ Cantrell-Griffin Business Brokers, | ) | |
| an Arkansas LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-CV-0162-CVE-CDL |
| | ) | |
| PRECISION | ) | |
| COMMUNICATIONS, INC., | ) | |
| an Oklahoma corporation, and | ) | |
| KAREN KYMAN, | ) | |
| a resident of the state of Oklahoma, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court are plaintiff WRTGC-Commercial, LLC's motion for partial summary judgment on a portion of its breach of contract claim (Dkt. # 47), and defendants' Precision Communications, Inc.'s (PCI's) and Karen Kyman's joint motion for summary judgment (Dkt. # 48).

In its motion (Dkt. # 47), plaintiff states that it has shown, as a matter of law, that PCI owes plaintiff a commission for the sale of its assets consummated in March 2020. Defendants deny that they owe plaintiff any commission because plaintiff is not a party to the contract or, alternatively, because plaintiff's agent breached his fiduciary duties to defendants (Dkt. # 59). Plaintiff has filed a reply (Dkt. # 75). The motion is fully briefed.

In defendants' motion (Dkt. # 48), defendants argue that plaintiff cannot bring any claims against defendants, as plaintiff is not a party to the contract at issue. Defendants state no commission is owed for the sale of the PCI's assets, Kyman's goodwill, or Kyman's real estate, because the contracting entity was illegally conducting business in Oklahoma without a license. In its response

(Dkt. # 58), plaintiff argues that it is the proper contracting party, that it is licensed to conduct business in Oklahoma, and that it has properly stated breach of contract claims against PCI and Kyman. Plaintiff further contends that, even in the absence of enforceable contracts, it is owed commissions on the sales it brokered under a theory of quantum meruit and fraud. Defendants filed a reply (Dkt. # 76), and the motion is fully briefed.

## I. Background

Plaintiff, WRTGC-Commercial, LLC, is an Arkansas limited liability company that was created in Arkansas on November 18, 2009. Dkt. # 47-1. Plaintiff has been licensed to do business in Oklahoma since February 11, 2010. Dkt. # 47-2. "Cantrell-Griffin Business Brokers" has been a registered trade name of plaintiff since December 18, 2012. Dkt. # 47-3. Stewart Nance works for Cantrell-Griffin Business Brokers. Dkt. # 58-15, at 2.[1]

In 2017, Nance approached PCI's president and sole shareholder, Karen Kyman, about the possibility of serving as a business broker for the sale of PCI. On March 27, 2019, Kyman sent Nance an email attaching a presentation that an earlier broker had put together for the potential sale of the business. Dkt. # 75-3. That package stated that "long-term relationships with large clients and partners" were a competitive advantage of PCI. Id. at 11. The presentation stated that "PCI office, ship, and land [were] available as well." Id. at 15. It stated that those assets were "[c]urrently

---

[1]     PCI states that this statement is "unsupported and denied." Dkt. # 59, at 6. However, the Court finds that it is supported by Nance's sworn testimony, which is supported further by his email signature block in communications with PCI. Dkt. # 47-12. PCI's assertion that Nance represented that Cantrell-Griffin Business Broker was an LLC, does not demonstrate that Nance is not an independent contractor for WRTGC-Commercial, LLC d/b/a Cantrell-Griffin Business Brokers.

leased from Karen Kyman." Id.  It also stated that the shareholder (Kyman) was "[o]pen to transferring 100% of [the] company to the right buyer." Id.

On March 28, 2019, David Jones, an attorney, wrote to Nance, stating that he represented PCI and Kyman.  Dkt. # 47-8, at 2.  He stated that he attached his proposed mark-up of the "standard listing agreement/real estate contract" that Nance had sent to Kyman.  Id.  He wrote that he did not believe his comments and edits "substantively change[d] the agreement Karen [Kyman] reached with [Nance]."  He outlined that those terms were "6% commission[,] 12 month agreement which can be terminated upon paying a 3% cancellation fee[,] 3% commission if Karen [Kyman] brings the buyer to the table."  Id.  He also "tweaked the agreement to clarify that PCI does not own the real estate and that the [$]9.6 million asking price does not include real estate."  Id.  Jones also added additional terms.  He proposed that "if Karen has to carry some of the purchase price, you'll receive the commission when she receives her payment[,]" that "if the buyer requires working capital (cash or receivables),  you won't receive a commission on the cash transferred to the buyer[,]" that Nance "won't receive a commission on any post-closing wages paid to Karen[,]" and that "[i]f the buyer leases rather than purchases the real estate, you won't receive a commission on the lease payments." Id.

Later that day, Nance replied to Jones.  Dkt. # 58-11, at 10.  In that email, he replied to the clarification of the fact that PCI does not own the real estate, stating "[m]y apologies for not making this apparent with the two agreements to begin with> [sic] I had just focused on the business listing discussions with Karen [Kyman] to this point but had told [her] we would handle the real estate in a separate agreement since it is owned by a different entity (her).  I use an Oklahoma licensed broker in our firm to handle OK real estate transactions and suggest we send a separate agreement for the

real estate sale to Karen." Id.  In that email, Nance agreed to the pro rata commission payment structure, the exclusion of cash or receivables from the commission, and the exclusion of Kyman's post-closing wages from commission.  Nance, however, did object to the exclusion of a commission on the lease of the real estate. Id.  He stated "[i]f we sell or lease the real estate, C[antrell ]G[riffin ]B[uisness ]B[rokers] should get a commission." Id.  He stated that "[i]n either case, we are OK licensed real estate agents and will help negotiate the sale or lease." Id.  He continued that he "had told Karen we would handle the real estate in a separate agreement since its [sic] owned by a different entity.  Don't see why we need to address in the business listing agreement." Id.

On April 9, 2019, Jones emailed Nance and copied Kyman.  He attached a revised listing agreement which removed "any reference to the real estate," stating that he understood Nance "will be providing a separate agreement between an Oklahoma real estate broker and 506 Industrial Road, LLC. Under such agreement, commission will be due upon sale of the real estate but no commission due upon lease of the real estate." Dkt. # 58-10, at 2.  Jones and Nance then proceeded to discuss whether commission would be owed on the sale of accounts receivable.  Ultimately the parties agreed that it would be excluded.  Dkt. # 58-11, at 2.

Later that month, a business listing contract was executed ("listing contract").  Dkt. # 47-6. The heading of each page of that document states "Cantrell-Griffin Business Brokers" above the text "Business Listing Contract."  The first paragraph of the listing contract states:

> "In consideration of the services of WRTGE-Commercial, LLC, through tis [sic] CANTRELL-GRIFFIN BUSINESS BROKERS division hereinafter called 'Agent,' in selling, leasing or exchanging the stock or assets of the business described herein, Karen Kyman, as the sole stockholder of Precision Communications, Inc. (PCI) (herein, Kyman and PCI collectively called "Seller") agrees that the Agent shall have the exclusive right to sell the assets or the stock of PCI during the [12 month] term . . ."

Id. at 1 (underline in original).

4

The listing contract states that the "gross offering price" would be $9,600,000, or such lesser price or terms as the Seller may accept.  Id.  The listing contract also sets out the parameters for payment of the agent.  "Seller agrees to pay Agent's full commission when and to the extent that [s]eller receives the sale price, and [s]eller grants a security interest in said proceeds of the closing. Seller agrees to pay [a]gent a professional fee of six percent (6%) of the gross amount of the sale price (the 'Gross Purchase Price') . . . This fee shall not be less than $100,000.00.  This shall include partial sale of assets, an equity interest, or any method of transfer . . . ."  Id.  To the extent the seller would receive the payment in installments, the contract provides that the "[a]gent's fee due hereunder shall be due on a pro rata basis."  Id. at 2.

The listing contract states that the real property, on which PCI operated at the time of the listing contract's execution, was not included in the gross offering price.  Id.  That property was not owned by PCI.  The listing contract states that "[a]ny listing agreement between 506 Industrial Road, LLC, and the [a]gency will be by separate agreement."  Id.[2]

The final term in the listing contract states that the "written contract constitutes the entire agreement concerning the subject matter hereof between the parties and supercedes any previous oral agreements or understandings.  This agreement may not be modified except in writing executed by both the Seller and by the Agent."  Id. at 4.

On the last page of the listing contract, the signature blocks state that one contracting party is "WRTCG-Commercial, an Arkansas Limited Liability Company through its Cantrell-Griffin

---

[2]     The parties agree that, at the time the listing contract was signed, it was mistakenly believed that the property on which PCI operated was owned by 506 Industrial Road, LLC.  However, the real estate described in the listing agreement was actually owned by the Karen S. Kyman Revocable Trust.  Kyman serves as trustee of that trust.

Business Brokers Division," and the other contracting party is "Precision Communications, Inc., an Oklahoma corporation." Dkt. # 47-6, at 4. Karen Kyman signed the contract on behalf of PCI.

On April 26, 2019, Nance emailed Kyman, attaching an Oklahoma real estate form listing agreement and stating that he would "appreciate [Kyman] reviewing [it] and getting back to [him] at [her] earliest convenience." Dkt. # 75-7, at 2. The agreement attached described the property on which PCI operates at 506 Industrial Road, in Grove, Oklahoma. Id. at 7.

On April 30, 2019, Nance responded to an inquiry from a private equity firm regarding PCI. Dkt. # 75-4, at 6. In that email exchange, Nance explained the value presented by PCI and the circumstances of the business. On May 1, 2019, Nance explained to the interested party that the business with real estate was "valued at $10.2M by [Kyman's] financial advisors." Id. at 4. Nance stated that the sale would probably need to be a "stock sale due to all the licenses and certifications [the] company has." Id. On May 6, 2019, Nance explained to the interested party that the real estate had been appraised at $400,000 in 2018. On May 7, 2019, Kyman, after having seen the email exchange with the interested party, wrote to Nance, stating that "just for clarification the property was appraised in 2017 and I actually think he [sic] now would appraise between [$]450,000 and [$]500,000 because since that time we completely remodeled the inside of the building and I also added a nice storm shelter that holds 10 to 12 people." Id. at 2.

On May 8, 2019, Kyman emailed Nance, stating "I haven't forgotten about getting a signed copy of the Property Listing Agreement to you but after I read through it this morning I had a few questions for David Jones. As soon as I hear back from him, I'll let you know." Dkt. # 75-5, at 2.

Shortly after the listing agreement was signed, Nance began to advertise the business to prospective buyers. The listing stated that the asset asking price was $10,400,000, which included

6

furniture, fixtures, equipment, inventory, and a tower.  The listing states that real estate is not included in the asking price, but that it had an estimated value of $550,000.  Dkt. # 75-9, at 2.  The listing states that PCI's facilities are rented, but that they are "available for purchase at appraised value."  Id.

During the sale process, Kyman and PCI were represented by Richard Riddle.  Dkt. ## 47, at 5; 59, at 11. On July 28, 2019, Riddle sent an email to Kyman with the subject line "PCI Asset Sale and Kyman Personal Goodwill Sale," regarding a possible sale to Bo Byers.  Dkt. # 58-17, at 2.  Riddle attached three letters of intent (LOIs) , describing them as between a buyer and PCI (for PCI assets), between the buyer and Kyman (for the sale of Kyman's personal goodwill), and an LOI for Kyman's employment.  The email states that there is a likelihood "that there will be Corporate Goodwill belonging to PCI as well as the [p]ersonal [g]oodwill belonging to you."  Id.

Thereafter, Sean Wenger, an employee of Promise Three, LLC (Promise Three), learned of the possibility of purchasing PCI.  Nance connected Wenger to PCI.  Dkt. ## 47, at 5; 59, at 11.  On November 7, 2019, Promise Three sent a letter of intent (LOI) to Karen Kyman.  Dkt. # 58-14, at 2-4.  The letter summarized the principal terms to acquire PCI.  Promise Three offered to pay PCI $3,389,333 "cash at close," with $6,610,670 in earn out payments, for a total purchase price of $10,000,000.  Id.  The LOI stated that the offering purchase price included the real estate, that the transaction would be structured as an asset sale, and that Kyman would "help Promise Three evaluate and secure key managers post acquisition."  Id.  The LOI proposed that Kyman would join the board of directors through the earn out period with an option to stay on after that period, as well as consult for Promise Three and "ensure a smooth transition for the PCI team."  Id. at 3.  The LOI also

proposes a "10 year non-compete and non-solicitation signed by all PCI shareholders and key management." Id.

On November 11, 2019, Riddle emailed Kyman and copied Nance.  In that email, Riddle discussed the separation of enterprise good will and personal goodwill and noted that the structure of personal goodwill was "very important" to Kyman for income tax purposes. Dkt. # 58-18, at 3.

On November 12, 2019, Nance emailed Kyman and Riddle in reference to the offer from Promise Three. Dkt. # 75-6.  Nance discussed a counter-offer and included notes for Riddle.  Id. at 2.  Those notes state "[r]eal estate available from [Kyman] at appraised value.  Do you want an updated appraisal? Didn't you do all the office updated since the 2013 appraisal?"  Id.  The notes also break down the "asset sale allocation" into PCI tangible assets and goodwill.  Id.  Goodwill is further broken down into "Business Goodwill" and "KK Goodwill."  Id.

Kyman responded that day, stating that she wanted "a qualified appraiser to perform an up to date appraisal on the property."  Id.  She continued that "[a]s an option, [Promise Three] could rent [the] property until they are ready to purchase and of course they will always have [the] first opportunity to purchase property."  Id.

On December 10, 2019, Promise Three sent four additional LOIs to Kyman respectively titled: "Personal Goodwill Letter of Intent," "PCI Asset Purchase Letter of Intent," "Employment Agreement Letter of Intent," and "Real Estate Letter of Intent."  The personal goodwill LOI summarized "the principle [sic] terms by [Promise Three] to acquire all of the personal goodwill owned by Karen Kyman ("Seller") associated with [PCI]." Dkt. # 98-1, at 1.  The personal goodwill LOI states that "70% of the aggregate enterprise goodwill owned by PCI and personal goodwill owned by [Kyman] will be allocated to the sale of the personal goodwill by [Kyman] to [Promise

8

Three].  The parties shall determine the amount of [Kyman's] personal goodwill using the residual method of allocation as required under applicable Federal income tax law . . . ."  Id.

The PCI Asset Purchase LOI proposes $3,750,000 cash at close for PCI, $600,000 for the real estate, and approximately $6,507,000 in earn out payments.  Id. at 4.  The "[t]otal purchase price" was stated as $10,932,000.  Id.  The real estate LOI proposes the sale of the real estate "used by [PCI]."  Id. at 10.  All of the LOIs were executed by Kyman on December 16, 2019.

On March 13, 2020, Nance issued a draft invoice for brokering the sale of PCI's assets to Precision Communications, LLC (PCLLC), a new entity formed by Promise Three, LLC, to acquire PCI's assets.  Nance explained that "[c]ommissions were calculated at 6% of the cash anticipated to be received as we discussed when we first negotiated the listing."  Dkt. # 59-6, at 1.  He included in the draft invoice a commission for the sale of the real estate, as well as commission for the sale of accounts receivable, equipment, and goodwill.  Id.  He acknowledged that"[o]ur initial plan we agreed to over a year ago was to list real estate separate from the business since you owned it personally but you later decided not to sell it, so we didn't complete the listing.  Then I brought you a buyer for it last fall and negotiated the sale of the business properties at appraised value which you accepted."  Id.

On March 16, 2020, Kyman and PCI entered into an asset purchase agreement (APA) with PCLLC. Dkt. ## 47, at 5; 59, at 11; 48-9.  PCLLC also entered into a "Personal Goodwill Purchase Agreement" with Kyman.  Dkt. # 48-10.

On March 25, 2020, Riddle wrote to Nance regarding the draft invoice that Nance had submitted on March 13.  In that email, Riddle explained that the numbers had not been finalized as of the date Nance had sent the invoice and stated "for that reason" he would not address the invoice.

9

Dkt. # 47-12, at 4.  Riddle stated that at closing, due to various circumstances, "PCI agreed to pay PCL[LC] a total of $1,875,066.45 . . . to cover the working capital needs of PCL[LC]."  Id.  Nance replied, stating that he saw "nothing in the APA on related assets sold," including real estate and personal goodwill, and that he believed he was owed commission on those transactions as he brought the buyer for those assets and negotiated the sale of them as well.  Id. at 3. Nance asked that Riddle acknowledge the payment obligation.  Id.

On March 26, 2020, Riddle replied to Nance, stating that "the net amount received by PCI" at closing was $1,374,933.55.  Dkt. ## 47, at 5; 59, at 11.  He stated that $1,398,382.45 remained to be paid out with future earn-out payments.  He did not address in the reply the sale of the real estate, or the sale of Kyman's personal goodwill.  Neither party disputes that PCI received those proceeds at closing. Dkt. ## 47, at 5; 59, at 11.

On April 22, 2020, plaintiff, WRTGC-Commercial, LLC, filed a complaint in this Court asserting breach of contract claims (count 1), a claim for declaratory judgment (count 2);  fraud claims (count 3); and claims for quantum meruit (count 4) against Kyman and PCI.

In its motion for partial summary judgement, plaintiff argues that, under Oklahoma law, to be entitled to partial summary judgment on this part of its claims it must establish there was a contract between WRTGC and PCI, that PCI breached the contract, and that WRTGC suffered damages as a direct result of the breach. Dkt. # 47, at 6 (citing Okla. Unif. Jury Instr. 23.1).  Plaintiff argues that it is evident from the face of the contract that the parties are Cantrell-Griffin Business Brokers (a fictitious name for plaintiff) and PCI.  Id. at 7.  Plaintiff argues it has pointed to provisions in the contract that require payment of certain amounts upon closing, and that the non-

10

payment is a breach of those material provisions.  Id. at 7-8.  Finally, plaintiff argues it has been

damaged it by the non-payment in the amount of $82,496.01.  Id. at 8.

Defendants respond (Dkt. # 59) that Nance breached the "duty of perfect good faith" owed

to PCI, by misrepresenting whether the real estate sale was critical to the sale of PCI, and so "Nance

and his [p]rincipal are [b]arred from [a]ny [r]ecovery."  Dkt. # 59, at 19-20.

Defendants also assert that Nance distributed materials that stated he worked for Cantrell-

Griffin Business Brokers, LLC, and so the listing agreement was actually with that entity.

Defendants argue that, as a result, plaintiff is not the true contracting entity, and that the actual

contracting entity (Cantrell-Griffin Business Brokers, LLC) is not licensed to conduct business in

Oklahoma.  As a result, the actual contracting entity is barred from recovery because conducting

business in Oklahoma, which is a  criminal misdemeanor, and "[c]ontracts in furtherance of a crime

are void under Oklahoma law."  Id. at 21.  Finally, defendants argue that Nance and his principal are

guilty of spoilation of evidence, because they have removed the LLC designation from

Cantrell-Griffin Business Brokers materials in an attempt to destroy evidence.  Id. at 24.

Plaintiff replies (Dkt. # 75) that it is the true contracting entity, and that it is licensed to do

business in Oklahoma.  Dkt. # 75, at 14.  Plaintiff also asserts that the alleged breach of the duty of

"perfect good faith" by Nance does not bar plaintiff's recovery.  Id. at 13-14.  Plaintiff further argues

that the doctrine of in pari delicto is not applicable to this situation.  Id. at 15-16.  Finally, plaintiff

states that spoilation does not preclude plaintiff's recovery and the motion for sanctions based on

alleged spoilation is not properly before the Court.

In defendants' motion for summary judgment (Dkt. # 48), defendants argue that each of the

four claims against Kyman must be dismissed as the contract for commission does not include

Kyman as an individual, and therefore does not include the sale of her personal goodwill.  Further, defendants assert that plaintiff has not demonstrated the existence of fraud.  Dkt. # 48, at 7-10. Defendants also argues that the quantum meruit claims should be denied against PCI because there is a written contract that forecloses that cause of action.  Id. at 17.  Defendants finally assert that the listing contract between plaintiff and PCI is unenforceable as plaintiff is not the contracting entity, and because the true contracting entity is a non-existent LLC doing business in Oklahoma without a license.  Id. at 18-21.  Finally, defendants argue that Nance and his principal "are guilty of spoilation."  Id. at 23.

In response, plaintiff asserts that it has valid contractual claims against Kyman under the listing contract, as circumstances indicate that she intended to sign the listing contract as an individual.  Dkt. # 58, at 13.  Plaintiff states that none of defendants' affirmative defenses precludes recovery on the breach of contract claim.  Plaintiff also argues that the Court should enter a declaratory judgment in favor of plaintiff that a commission is owed on the amount paid under the APA, as well as amounts paid under the personal goodwill purchase agreement.  Id. at 16.  Plaintiff also asserts that it has stated valid claims against Kyman for quantum meruit and constructive fraud based on brokering the sale of her goodwill and real estate.  Id. at 17.  Plaintiff maintains that it is licensed to do business in Oklahoma and is the proper party to the listing contract.  Id. at 23.  Finally, plaintiff argues that a motion for sanctions based on alleged spoilation should be denied as it was improperly brought in the summary judgment motion.  Id. at 25.

## II. Legal Standard

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.

12

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Movants for summary judgment bear the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." Silverstein v. Federal Bureau of Prisons, 559 F. App'x 739, 752 (10th Cir. 2014)[3]; see also Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 670–71 (10th Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

As defendants have moved for summary judgment on all claims, the Court will address the claims in the manner in which they were alleged in the amended complaint.

---

[3]      This and other unpublished decisions are not precedential, but they are cited herein for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

### III. Breach of Contract

To prevail on a breach of contract claim, plaintiff must show: "1) formation of a contract; 2) a breach of the contract; and 3) actual damages suffered from the breach." <u>Coen v. SemGroup Energy Partners G.P., LLC.</u>, 310 P.3d 657, 666 (Okla. Civ. App. 2013) (citing <u>Digital Design Grp., Inc. v. Info. Builders, Inc.</u>, 24 P.3d 834, 843 (Okla. 2001)).

#### *a. Contracting Parties to the Listing Contract*

Plaintiff states that there is no genuine issue of material fact as to any of the elements above. However, defendants predominantly challenge whether plaintiff is even the appropriate contracting party, as plaintiff's LLC name appears nowhere in the listing contract.

Under Oklahoma law, to form a valid contract the parties must be capable of contracting, they must consent, the contract must be lawful, and there must be sufficient cause or consideration. Okla. Stat. tit. 15, § 2. Plaintiff asserts that both parties were capable, consented to the listing contract, the object of the contract was the agreement to retain someone to sell the stock or assets of PCI, and that there was mutual consideration. Dkt. # 47, at 6. PCI does not dispute that PCI is capable of contracting, or that the object of the contract (retaining a broker) is lawful. PCI also does not dispute that there was mutual consideration. However, defendants challenge whether plaintiff is the proper party to the contract, and whether Kyman, as an individual, is a party to the contract.

First, the Court must determine whether plaintiff is a party to the listing contract. Plaintiff asserts that it is the appropriate contracting party by and through its agent Stewart Nance of its Cantrell-Griffin Business Brokers division. Dkt. # 47, at 6-7. Defendants argue that plaintiff's name–WRTGC-Commercial, LLC– does not appear in the contract, so it is not a party to the listing agreement. Defendants also assert that Nance represented to PCI that he worked for Cantrell-Griffin

14

Business Brokers, LLC.  Defendants argue that, because Cantrell-Griffin Business Brokers, LLC is not licensed to do business in Oklahoma, the contract is void as "in furtherance of a crime," specifically, the misdemeanor of conducting business without a license in Oklahoma. Dkt. # 59, at 20-21, 23-24.  Defendants state that, as a result, the listing contract is void under the doctrine of in pari delicto.

In Oklahoma, "[i]f it appears from the allegations and proof that the obligation sued upon was intended to be the obligation of the corporation sued, a recovery will not be defeated by reason of a misnomer alone.  Such a misnomer of the corporation will not prevent a recovery 'either by or against the corporation in its true name, provided its identity with that intended by the parties to the instrument be averred in the pleadings and apparent in the proof.'"  Oklahoma Operating Co. v. Shipley, 43 P.2d 445, 447 (Okla. 1935).  "It is enough if the identity of the corporation is unmistakable, either from the face of the instrument or from the averments and proof."  Id.; see also HM of Topeka, LLC v. Indian Country Mini Mart, 236 P.3d 535, 539 (Kan. App. 2010) (holding that "misidentification of a contracting party's legal name in a contract does not, in and of itself, prohibit any party to that contract from enforcing it as long as the entity's true identity is reasonably clear or

can be ascertained by sufficient evidence and the other parties to the contract were not, or were not likely to have been, misled by the misidentification.").[4]

The evidence shows that WRTGC-Commercial, LLC is an entity incorporated as an LLC in Arkansas (Dkt. # 47-1), is licensed to do business in Oklahoma (Dkt. # 47-2), and has duly registered the fictitious name of Cantrell-Griffin Business Brokers (Dkt. # 47-3). Plaintiff has introduced evidence that Nance is an independent contractor for plaintiff, and defendants fail to introduce evidence that he is not. Plaintiff WRTGC-Commercial, LLC has shown that it was heavily involved in the contracting process, through Nance. Further, the name "Cantrell-Griffin Business Brokers" appears no fewer than six times on the contract. It is not misspelled and it does not bear the LLC designation. Dkt. # 47-6.

Meanwhile, neither defendant shows (or even contends) that PCI intended to enter into a contract with either "WRT**CG**-Commercial, LLC" or "WRT**GE**-Commercial, LLC" or that

---

[4] Other jurisdictions similarly hold that "the misnomer of a corporation generally will not be treated by the courts as material if the identity of the corporation is reasonably clear or can be ascertained by sufficient evidence." HM of Topeka, LLC, 236 P.3d at 539 (citing 6 Fletcher Cyclopedia of the Law of Private Corporations § 2444 (2005)); see also Cheese Depot, Inc. v. Sirob Imports, Inc., No. 14-CV-1727, 2018 WL 1801792, at *5–6 (N.D. Ill. Apr. 16, 2018) ("[T]here is a general concurrence of modern authority to the effect that a misnomer or variance from the precise name of the corporation in a grant or obligation by or to it is not material if the identity of the corporation is unmistaken either from the face of the instrument of from the averments and proof.") (quoting Malleable Iron Range Co. v. Pusey, 148 Ill. App. 344, 347 (Ill. App. 1909), aff'd 91 N.E. 51 (Ill. 1910)); Sunstone at Colorado Springs Homeowners Ass'n, Inc. v. White, 56 P.3d 127, 130 (Colo. App. 2002) (concluding that "the variation or misnomer in plaintiff's name as set forth in the [legal document was] immaterial" in part because "there [was] no evidence that the misnomer ... frustrated the identification of plaintiff or caused confusion to defendants"); In re D & B Construction of Westchester, Inc., 2008 WL 4890945, at *8 (N.Y. Sup. Ct. Nov. 3, 2008) ("If the entity of the corporation can be ascertained by the instrument itself, the misnomer is held unimportant; but, if not, evidence may be introduced ... to establish what particular corporate entity was intended.").

"WRT**CG**-Commercial, LLC" or "WRT**GE**-Commercial, LLC" even exist.  Defendants do not show that they were misled by either of those misnamed/misspelled entities, let alone that they were materially misled by those names.  Where, "it d[oes] not appear that anyone was, or likely could have been, misled by the incorrect designation" a court will find that the misnomer does not prevent enforcement of the contract.  HM of Topeka, LLC, 236 P.3d at 539.

Given plaintiff's evidence demonstrating proof of ownership of the Cantrell-Griffin Business Brokers name, and the complete absence of any evidence of malfeasance regarding the naming of the entity in the contract, the Court finds that the parties intended that the named LLCs in the contract–"WRT**GE**-Commercial, LLC" (on the first page of the contract) and "WRT**CG**-Commercial, LLC" (on the last page of the contract)–were intended to identify plaintiff WRT**GC**-Commercial, LLC.  "Misidentification of a contracting party's legal name in a contract does not, in and of itself, prohibit any party to that contract from enforcing it as long as the entity's true identity is reasonably clear or can be ascertained by sufficient evidence and the other parties to the contract were not, or were not likely to have been, misled by the misidentification.  Id. at 540.  Accordingly, the Court finds that plaintiff is properly a party to the contract.

Defendants also assert that Kyman is not a party to the contract, and thus cannot be liable for breach of contract.  Dkt. # 48, at 11-12.  Plaintiff responds that, if the Court looks to the circumstances surrounding the agreement, it is apparent the parties intended that Kyman would be a party to the contract. Dkt. # 58, at 17.  The essence of the parties dispute is whether Kyman signed the contract as the president of PCI, or whether she also signed as the sole shareholder of PCI stock and as an individual.

"The primary goal of contract interpretation is to determine and give effect to the intention of the parties at the time the contract was made. In arriving at the parties' intent, the terms of the instrument are to be given their plain and ordinary meaning. Where the language of a contract is clear and unambiguous on its face, that which stands expressed within its four corners must be given effect. A contract should receive a construction that makes it reasonable, lawful, definite and capable of being carried into effect if it can be done without violating the intent of the parties." State ex rel. Doak v. Red Rock Ins. Co., 444 P.3d 493, 495 (Okla. Civ. App. 2019) (quoting May v. Mid-Century Ins. Co., 151 P.3d 132 (Okla. 2006) (footnotes omitted).

Kyman is identified as the "sole shareholder" of PCI in the first section of the contract. Dkt. # 48-8, at 1. "Kyman and PCI" are defined "collectively" as "Seller." Id. In the eighth section of the contract, "Seller agrees to pay [a]gent's full commission." Id. However, Kyman's signature appears on the contract below the words "Precision Communications, Inc., and Oklahoma Corporation," and above the signature line for "Karen Kyman, President." Id. at 3.

From the face of the document it does not appear as though Kyman, the individual, intended to be held personally liable for the corporate liabilities of PCI. The document refers to Kyman only in her capacities as sole shareholder and president of PCI. Plaintiff has not explained how Kyman, as the shareholder, could be held liable for PCI's failure to pay a commission on the sale of PCI's assets. In Oklahoma, shareholders are not primarily liable for corporate liabilities. Okla. Stat. tit. 18, § 1124. Without any statement as to how Kyman, as sole shareholder, is a proper party, the Court finds that the breach of contract action against Kyman should be dismissed. Cf. Fanning v. Brown, 85 P.3d 841, 846 (Okla. 2004) (holding that "[c]ourts may disregard the corporate entity and hold stockholders personally liable for corporate obligations or corporate conduct under the legal

doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice."). Accordingly, Kyman as a sole shareholder, is not a proper party to the breach of the listing contract claim.

To the extent plaintiff seeks to hold Kyman liable as an individual, the Court does not find that any evidence presented plausibly demonstrates that Kyman intended to be personally liable for the corporate obligations of PCI. Plaintiff also does not allege fraud in the formation of the listing contract. "A unilateral mistake by one party, in the absence of evidence of inequitable conduct by the other party, does not justify reformation under Oklahoma law." Fid. & Deposit Co. of Maryland v. Riess Fam., LLC, No. 16-CV-270-GKF-FHM, 2018 WL 2088757, at *11 (N.D. Okla. May 4, 2018).

Plaintiff has not shown that Kyman is liable as a shareholder under the listing contract, and plaintiff has not shown that Kyman intended to be personally liable for the performance of PCI. As a result, the Court finds that the breach of contract claim for the non-payment of a commission under the listing contract cannot be maintained against Kyman as an individual or sole shareholder. Therefore, defendants' motion for summary judgment as to the breach of contract claim against Kyman is granted.

*b. PCI's Affirmative Defenses*

Plaintiff argues that it has shown under Oklahoma law that the commission was due to it at the time of the closing, when the initial payment was made to PCI. PCI argues that no commission is due because Nance breached his fiduciary duties of good faith and loyalty when brokering the deal and engaged in false misrepresentation. Dkt. # 59, at 16. The Court next addresses defendants'

arguments regarding actions of plaintiff or Nance that make non-payment of commission appropriate.

First, defendants assert that Nance breached his fiduciary duties to PCI, specifically his duty of loyalty and his duty of good faith. Dkt. # 59, at 16-17. Defendants assert that plaintiff, through Nance, misrepresented whether the sale of the real estate on which PCI operated was material to the transaction to both Promise Three, LLC and to PCI. Id. Plaintiff responds that PCI has not stated a valid claim for breach of fiduciary duty to PCI, where PCI had no interest in the real estate portion of the transaction and, thus, could not sell it. Dkt. # 75, at 13.

As an initial matter, PCI cites no case wherein a breach of fiduciary duty serves as an affirmative defense to performance of a contract. PCI has never asserted a counterclaim of breach of fiduciary duty. PCI cannot show that a fiduciary duty was breached in relation to the sale of real estate that it did not own. Defendant Kyman has not asserted a counterclaim that plaintiff breached any fiduciary duties to her, as the trustee of the trust that owns the property or as the owner of her goodwill.

Even if the Court were to construe PCI's unstated claim for breach of fiduciary duty as an affirmative defense based on fraudulent misrepresentation, PCI's claim still fails. Defendants' general assertions--that false representations made while brokering a deal for real estate that PCI does not own somehow voids PCI's business listing agreement and relieves it of its obligation to pay any commission on a valid sale of PCI assets, Kyman's goodwill, and Kyman's trust's real estate-- are not supported by law. Dkt. # 48, at 21.

"Fraud in the inducement is defined as a 'misrepresentation as to the terms, quality or other aspects of a contractual relation, venture or other transaction that leads a person to agree to enter into

20

the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken.'" Harkrider v. Posey, 24 P.3d 821, 827 (Okla. 2000) (citation omitted).  Oklahoma law distinguishes between contracts that are void or voidable due to a misrepresentation made before the contract is entered.  Glob. One Eng'g, LLC v. SiteMaster, Inc., No. 15-CV-0583-CVE-FHM, 2017 WL 3189892, at *3 (N.D. Okla. July 27, 2017).  "A contract entered into by a party on the basis of a misrepresentation about the nature of the contract itself is void and the contract is a legal nullity." Id.  "[W]here a contract is entered into on the basis of a misrepresentation which goes to the contract's inducement, as a notion distinct from its nature, the tainted agreement is rendered merely voidable."  Harkrider, 24 P.3d at 827. As PCI does not (and likely cannot) assert that any statement about the real estate affects the essence of the contract itself (i.e., that is contracting for the exclusive listing of a business), PCI's only argument is that the contract is voidable as a result of any alleged misrepresentation.

"A contract voidable for fraud in the inducement creates a valid contractual relationship, which subsists in contemplation of law until the parties are relieved of their obligation by a decree of rescission."  Id.  Therefore, in order to be relieved of the requirement to perform the contract, PCI must show that the fraud in the inducement requires rescission.  Rescission is governed by Okla. Stat. tit. 15, § 235, which provides that rescission "can be accomplished only by the use, on the part of the party rescinding, of reasonable diligence to . . . restore to the other party everything of value which he has received from him under the contract; or must offer to restore the same, upon condition that such party shall do likewise . . ."  Defendants do not seek rescission of the listing contract.

21

Instead, without legal authority, they appear to contend that the remedy in this instance is non-payment of commission.   It is not.[5]

Because PCI has not raised a genuine dispute of material fact regarding whether Nance breached a fiduciary duty to it, and because PCI has not shown that it had any cause or basis to rely on information regarding the sale of real estate that it did not own, PCI has not shown that it was fraudulently induced to enter into the listing contract for PCI's assets or the sale of PCI's business assets to PCLLC.

Next, defendants assert, repeatedly, that Cantrell-Griffin Business Brokers held itself out as an LLC, and so Cantrell-Griffin Business Brokers is estopped from denying the existence of that entity.   Dkt. # 59, at 22-23.   To support that assertion, PCI submits exhibits that show certain Cantrell-Griffin Business Brokers materials include the LLC designation.   See, e.g., Dkt. ## 48-6; 48-7; 48-12.

PCI does not explain, at any point, how the representation of Cantrell-Griffin Business Brokers as an LLC was relied upon to the detriment of PCI.   Further, arguments to that effect would ring hollow where Cantrell-Griffin Business Brokers is actually a division of an LLC.   Assertions by PCI that Cantrell-Griffin Business Brokers's status as an LLC was material to the formation of the contract are further eviscerated by the fact that PCI signed the contract with Cantrell-Griffin Business Brokers by and through another LLC.   The agreement does not state anywhere that Cantrell-Griffin Business Brokers is an LLC and, yet, PCI entered the agreement.   Therefore, because

---

[5]   Further, the voidable contract at issue here would not be the business listing contract.   The voidable contracts would be those entered into based on the "false representations," i.e., those for the sale of the business, Kyman's trust's real estate, and Kyman's personal goodwill.

PCI does not allege that dealing with an LLC was material to inducing PCI to contract with that entity, defendants' arguments regarding any representation of Cantrell-Griffin Business Brokers as an LLC are unavailing.  PCI has not demonstrated that a genuine dispute of material fact exists as to whether the LLC status was a material term and that it relied on it in the formation of the contract.

The Court therefore finds that plaintiff has shown that there was a valid contract between PCI and plaintiff regarding the exclusive opportunity to broker the sale of assets of PCI, that there was a breach of that contract by non-payment of a commission, and that it suffered actual damages. Because PCI raises no genuine disputes of material fact in response to plaintiff's motion for partial summary judgment, the Court finds that it should be granted as to plaintiff's claim for breach of the listing contract.

### c.  PCI's Assets

The parties do not seriously dispute that the APA governs the sale of Kyman's trust's real estate, or that PCI's assets include the real estate on which PCI operated.  Such real estate was owned by a separate entity and is not governed by the listing contract. In fact, the contract expressly excludes the real estate.  Dkt. # 48-8, at 1.  As a result, any breach of contract claim against PCI or Kyman for a commission on the real estate sold to PCLLC is denied as a matter of law.

The only remaining issue with respect to the contractual commission owed by PCI is whether Kyman's goodwill is properly considered an asset of PCI under the listing contract.  Defendants argue that plaintiff has no entitlement to a commission on the sale of Kyman's goodwill because Kyman's goodwill is a personal asset, and thus not subject to the listing contract for brokering the sale of PCI's assets.  Dkt. # 48, at 13.  In support of that contention, defendants cite numerous cases where Oklahoma courts have found that personal goodwill is not a marketable asset in divorce proceedings under Oklahoma law.  Id. at 14.

Plaintiff argues that the facts and circumstances surrounding the formation of the listing contract make it evident that Kyman's goodwill was meant to be included in the overall value of the business, as appraised.  Dkt. # 58, at 18.  Plaintiff states that the parties cannot have intended that over $5,000,000 of the $9,600,000 contractual appraisal value, which was based on earnings before interest, taxes, depreciation, and amortization (EBITDA), is now fairly attributed to the non-PCI asset of Kyman's personal goodwill.  Plaintiff further states that it is evident that neither party contemplated the value of personal goodwill as "[t]here is no exception or carve out in the agreement for personal goodwill and the issue of personal goodwill was not discussed prior [to] the execution of the [a]greement."  Id.  Further, plaintiff notes that during the negotiations Riddle grouped personal goodwill under the umbrella of the "[g]eneral [g]oodwill of the business as a whole."  Dkt. # 58-18, at 3.

Courts generally recognize two types of goodwill: enterprise goodwill and personal goodwill.  See, e.g., In re Marriage of Dorsey, 373 P.3d 1084, 1088 (Okla. Civ. App. 2016); see also  May v. May, 589 S.E.2d 536, 541 (W. Va. 2003); Peterson v. Jackson, 253 P.3d 1096, 1106-07 (Utah Ct. App. 2011).  The value of goodwill "should be determined either by an agreement or by its fair market value."  Traczyk v. Traczyk, 891 P.2d 1277, 1280 (Okla. 1995) (citations omitted).

In Oklahoma, "goodwill of a business is defined as 'the expectation of continued public patronage,' and is considered property transferable like any other property."  Okla. Stat. tit. 60, § 315; see also Freeling v. Wood, 361 P.2d 1061, 1063 (Okla. 1961) ("The 'good will' value of any business is the value that results from the probability that old customers will continue to trade with an established concern.... [Such] good will of a business may be sold.")

24

Under Oklahoma law, personal goodwill has not been fully defined.  However, Oklahoma courts certainly recognize that the personal goodwill of an individual is a separate asset, not owned by a business.  Traczyk, 891 P.2d at 1280; In re Marriage of Dorsey, 373 P.3d at 1088.  Other persuasive authority holds that personal goodwill can be sold as an asset separate and apart from a business asset.  In Estate of Adell v. Comm'r, 108 T.C.M. (CCH) 107 (T.C. 2014), the United States Tax Court found that "[a] key employee may personally create and own goodwill independent of the corporate employer by developing client relationships." 108 T.C.M. (CCH) 107 (T.C. 2014) (citing Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 207–208 (T.C. 1998)).  In that case, the court explained that "[t]he corporation may benefit from using the personally developed goodwill while the key employee works for the entity, but the corporation does not own the goodwill and therefore it is not considered a corporate asset."  Id.  "The employee may . . . transfer any personal goodwill to the employer through a covenant not to compete or other agreement that transfers the relationships to the employer."  Id.  "Absent such an agreement, the employer cannot freely use the asset and the value of the goodwill should not be attributed to the corporation." Id.; see also Bross Trucking, Inc. v. Comm'r, 107 T.C.M. (CCH) 1528 (T.C. 2014).  In light of this authority, this Court finds that, in certain non-legal professions, personal goodwill is a personal, and saleable, asset.  Indeed, the IRS provides for it as such.  As a result, in absence of an agreement to the contrary, Kyman's personal goodwill is not an asset of PCI as a matter of law.  Kyman was within her rights to sell her personal goodwill, and the Court will not read the agreement for the sale of PCI's assets to include Kyman's goodwill.

### III. Declaratory Judgment

Under the contract terms, plaintiff is due 6% of "the gross amount of the sale price" of the topic of the agreement–namely, the "assets. . . of PCI." The contract further provides that "[s]eller agrees to pay [a]gent's full commission when and to the extent that [s]eller receives the sale price, and [s]eller grants a security interest in said proceeds of the closing. Seller agrees to pay [a]gent a professional fee of six percent (6%) of the gross amount of the sale price (the 'Gross Purchase Price') . . . This fee shall not be less than $100,000.00. This shall include partial sale of assets, an equity interest, or any method of transfer . . ." Dkt. # 47-6, at 1. To the extent the seller receives the payment in installments, the contract provides that the "[a]gent's fee due hereunder shall be due on a pro rata basis." Id. at 2.

At closing "the net amount received by PCI" of non-excluded assets was $1,374,933.55. Dkt. ## 47, at 5; 59, at 11. Therefore, at closing, plaintiff was due 6% of that amount under the listing contract, or $82,496.01.

### IV. Quantum Meruit

Defendants move for summary judgment on all claims made against Kyman on the basis that she is not a party to the listing contract. Dkt. # 48, at 11-13. Though the Court agrees that there is no breach of the listing contract properly stated against Kyman, that does not mean that Kyman is not a proper party to this action. Plaintiff asserts claims for relief against her that do not depend on whether she is a party to the listing contract, namely fraud and quantum meruit. Specifically,

plaintiff's claims against Kyman include a claim for quantum meruit for brokering the sale of her real estate, and a claim for quantum meruit for brokering the sale of Kyman's personal goodwill.[6]

Under the common law doctrine of quantum meruit, where "a person performs services without a written contract, the law implies an agreement to pay what is reasonable, meaning thereby what he reasonably deserves." Brown v. Wrightsman, 51 P.2d 761, 763 (Okla. 1935). A quantum meruit claim "applies only where there is no express contract." McCurdy Group v. Am. Biomedical Group, Inc., 9 F. App'x 822, 827 (10th Cir. 2001) (quoting Brown, 51 P.2d at 763). This claim requires that no written contract exist between the parties.

Defendant Kyman moved for summary judgment on the quantum meruit claims against her on the basis that she was not a party to the contract. This argument is nonsensical, as the claim expressly prohibits the existence of a written contract. With no basis to dismiss these claims, the Court finds denial of summary judgment appropriate as to the claims for quantum meruit stated against Kyman. However, as the Court has found a valid contract between PCI and plaintiff for a commission on the sale of PCI's assets, the claim for quantum meruit against PCI fails as a matter of law as the real estate and personal goodwill of Kyman are not assets of PCI.

---

[6]     Kyman appears to have been introduced to Precision Three through Nance. No party has shown there is agreement to list real estate owned by the Karen S. Kyman Revocable Trust and no party has shown that there was an agreement to list personal goodwill of Kyman. As a result, it is likely that breach of contract claims as to these assets are unlikely to be successful. However, under a theory of quantum meruit, plaintiff may still show that a commission is owed for brokering those transactions.

**V. Fraud**

To state a claim for constructive fraud against Kyman or PCI, plaintiff must show

(1) That the defendant owed plaintiff a duty of full disclosure. This duty could be part of a general fiduciary duty owed by the defendant to the plaintiff. This duty could also arise, even though it might not exist in the first instance, once a defendant voluntarily chooses to speak to plaintiff about a particular subject matter;

(2) That the defendant misstated a fact or failed to disclose a fact to plaintiff;

(3) That the defendant's misstatement or omission was material;

(4) That plaintiff relied on defendant's material misstatement or omission; and

(5) That plaintiff suffered damages as a result of defendant's material misstatement or omission.

Specialty Beverages, L.L.C. v. Pabst Brewing Co., 537 F.3d 1165, 1180-81 (10th Cir. 2008) (quoting

Lillard v. Stockton, 267 F. Supp. 2d 1081, 1113 (N.D. Okla. 2003) (applying Oklahoma law).

"There is no requirement, however, that the plaintiff prove that the defendant acted with the intent

to deceive." Id. (citing State ex rel. Okla. Bar Ass'n v. Lloyd, 787 P.2d 855, 860 n.16 (Okla. 1990);

Doerr v. Henry, 806 P.2d 669, 673 (Okla. Civ. App. 1991)).

Defendants assert that plaintiff cannot establish the elements of a claim of fraud.  Dkt. # 48,

at 19.   Plaintiff responds that "the fraud claim is based on a concealment of information by

defendants."   Dkt. # 58, at 20.   Plaintiff argues that constructive fraud applies here because

defendants "discussed goodwill with Nance but did not disclose that their intention was to exclude

from goodwill the personal goodwill." Id. at 20-21.  Further, plaintiffs assert that Riddle conveyed

that personal goodwill was part of the "general goodwill" of the business.  Id. at 21.  Nance,

according to plaintiff, relied on that understanding when he presented the concept to Promise Three

and obtained their agreement based on those terms.  Id.  It is evident that he believed the goodwill

was part of the sale he brokered by the invoice he later sent to defendants, seeking compensation based on the sale of PCI assets, Kyman's real estate, and Kyman's goodwill.  Id.; Dkt. # 59-6, at 1.

The above facts demonstrate that defendants voluntarily brought up personal goodwill with Nance and discussed it with him.  The facts also demonstrate that, at a minimum, defendants failed to disclose that they did not believe they owed a commission to plaintiff on the sale of Kyman's goodwill.  The materiality of that omission was demonstrated where it comprised approximately half of a sales price that, before the insertion of personal goodwill, had been predominantly based on EBITDA. Additionally, plaintiff has presented evidence that plaintiff relied on defendants' material misstatement or omission in the form of his emails showing that Nance grouped the personal goodwill of Kyman under general goodwill, much like Riddle did.  Plaintiff clearly demonstrates that the anticipated commission was greatly reduced by the omission.

Because plaintiff has pointed to specific evidence that creates a genuine dispute of material fact as to whether PCI or Kyman or both (both represented by Riddle) are liable for constructive fraud, the Court denies the motion for summary judgment as to this claim for relief.

**IT IS THEREFORE ORDERED** that plaintiff's motion for partial summary judgment (Dkt. # 47) is **granted**, and plaintiff is entitled to a partial judgment against PCI for a 6% commission on the sale of PCI assets, in the amount of $82,496.01 (6% of the total amount that was attributed to PCI assets).

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment (Dkt. # 48) is **granted in part** as to the breach of contract claim against Kyman, the declaratory judgment claim against Kyman, and the quantum meruit claim against PCI for the sale of its assets; and **denied in part** as to the breach of contract claim against PCI, the declaratory judgment claim against PCI, the

29

claims of fraud against PCI and Kyman, and the quantum meruit claims against Kyman for the sale

of her personal goodwill and the real estate owned by the Karen S. Kyman revocable trust.

**DATED** this 27th day of August, 2021.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE